UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KERRY MARSHALL, | : | CIVIL CASE NO. |
|     Plaintiff, | : | 3:10-cv-1009 (JCH) |
| | : | |
| v. | : | |
| | : | |
| TOWN OF MIDDLEFIELD, et al., | : | FEBRUARY 23, 2012 |
|     Defendants. | : | |

**RULING RE: PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. NO. 25), DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT (DOC NO. 32) & PLAINTIFF'S MOTION TO APPOINT COUNSEL (DOC. NO. 36)**

I.   INTRODUCTION

The plaintiff, Kerry Marshall ("Marshall"), brings this pro se action against the Town of Middlefield, Connecticut ("Middlefield") and Scott Halligan, a Middlefield Town Constable ("Halligan"), alleging numerous violations of his federal and state constitutional and statutory rights, as well as a common law tort, in connection with his receipt of tickets for Operating an Unregistered Motor Vehicle and Failure to Provide Proof of Insurance on March 10, 2011.

On July 25, 2011, Marshall filed a Motion for Partial Summary Judgment on his claims of unlawful detention under the Fourth Amendment to the United States Constitution and Article First, sections seven and nine of the Connecticut Constitution, as well as his claims of retaliation against protected speech in violation of the First Amendment to the United State Constitution and Article First, section 4 of the Connecticut Constitution.  Doc. No. 25.  Two days after filing the Motion, Marshall was detained in connection with unrelated federal criminal charges, of which he had been convicted on May 13, 2011.  See Detention Order Pending Sentencing (Doc. No. 180),

1

United States v. Marshall, Case No. 3:10-cr-14 (JCH) (D. Conn. July 27, 2011); Jury Verdict (Doc. No. 133), United States v. Marshall, Case No. 3:10-cr-14 (JCH) (D. Conn. May 13, 2011).  He did not, however, file a notice of his change of address until November 9, 2012.  Doc. No. 35.

On October 31, 2011, the defendants filed a Cross Motion for Summary Judgment on all counts of the Complaint.  Doc. No. 32.  On December 5, Marshall filed a Motion to Appoint Counsel.  Doc. No. 36.  On January 5, 2012, the court issued an Order directing the clerk to mail copies of the defendants' Cross Motion and accompanying submissions to Marshall at the Metropolitan Detention Center in Brooklyn, New York, and granting Marshall twenty-one days to file a response.  Doc. No. 37.  Marshall responded on January 20.  See Plaintiff's Memorandum in Opposition (Doc. No. 39) ("Pl.'s Mem. in Opp.").

For the following reasons, the court now denies Marshall's Motion for Partial Summary Judgment, grants in part and denies in part the defendants' Cross Motion for Summary Judgment, and, finally, denies Marshall's Motion to Appoint Counsel.

## II.   FACTS

The following facts are undisputed:  On the morning of March 10, 2010, Halligan pulled into the driveway of Marshall's resident at 465 Main Street, Middlefield, Connecticut, and parked behind Marshall's motor vehicle.  Affidavit of Kerry L. Marshall, July 23, 2011 (Doc. No. 25-2) ¶ 3 ("First Marshall Aff."); Affidavit of Scott Halligan (Doc. No. 32-1) ¶ 9 ("Halligan Aff.").  Halligan asked Marshall for his license, registration, and proof of insurance.  First Marshall Aff. ¶ 5; Halligan Aff. ¶ 10.  Halligan subsequently ticketed Marshall for Operating an Unregistered Motor Vehicle and Failure to Provide

Proof of Insurance.  First Marshall Aff. ¶¶ 4-5; Halligan Aff. ¶¶ 11-13.  At some point during this interaction, Marshall's brother, Alford Marshall, emerged from the house. First Marshall Aff. ¶ 6; Halligan Aff. ¶ 11.  Also at some point during this interaction, Halligan contacted additional officers who joined him in Marshall's driveway.  First Marshall Aff. ¶ 8; Halligan Aff. ¶ 12.

While the parties generally agree on what happened <u>after</u> Halligan pulled into Marshall's driveway, they offer entirely divergent narratives of the events that <u>preceded</u> Halligan's arrival.  Halligan's account runs as follows:  On the morning of March 10, he was parked in the parking lot of 480 Main Street, running random license plate checks with his police cruiser's mobile data terminal.  Halligan Aff. ¶ 3.  One of the cars in the parking lot, which Halligan recognized as belonging to Marshall, came up as an unregistered vehicle.  <u>Id.</u> ¶ 5.  Halligan waited, parked next to Marshall's car, for Marshall to emerge from the adjacent convenience store to discuss the issue of registration.  <u>Id.</u> ¶ 6.  Marshall saw Halligan and, upon exiting the store, ran behind the building in which the store was located.  <u>Id.</u> ¶¶ 7-8.  Halligan unsuccessfully attempted to follow Marshall to the rear of the building in his police cruiser.  <u>Id.</u> ¶ 8.  Marshall circled the building, got into his car, and drove away.  <u>Id.</u>  Halligan then followed Marshall, with his cruiser's lights flashing, to Marshall's driveway at 365 Main Street.  <u>Id.</u> ¶ 9.

Marshall, on the other hand, denies that he was present at any convenience store on the morning of March 10, denies that he attempted to evade Halligan, denies that Halligan followed him with activated police lights, and, finally, denies that he had, at any point that morning, "engaged via key the motor of either [his] Chevy Blazer Truck or

3

Lexus IS300 or had removed either vehicle onto any public roadway." Affidavit of Kerry L. Marshall, January 20, 2012 (Doc. No. 39) ¶¶ 2-3 ("Second Marshal Aff."). Instead, Marshall maintains that, when Halligan arrived at his driveway, he was simply "standing alongside and inspecting [his Lexus]." Id. ¶ 2.

At the time he was ticketed by Halligan, Marshall had a pending civil action against the Town of Middlefield in connection with a tax dispute. See State Complaint (Doc. No. 25-4). Marshall claims that, when he suggested that Halligan was ticketing him in retaliation for filing the suit, Halligan "became nervous and recoiled back to his police cruiser." Plaintiff's Local Rule 56 Statement of Material Facts Not in Dispute (Doc. No. 25-2) ¶ 4 ("Pl.'s 56(a)(1) St."). Halligan claims that he "had and still [has] no personal knowledge or involvement in [Marshall's] alleged tax dispute with the Town of Middlefield ." Halligan Aff. ¶ 17.

### III.  SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000). Once the moving party has met its burden, in order to defeat the motion, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record to address questions of fact, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary

judgment is sought. Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38. Summary judgment "is properly granted only when no rational finder of fact could find in favor of the non-moving party." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised, on the basis of the evidence presented, the question must be left to the finder of fact. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

Where a party is proceeding pro se, the court reads the pro se party's papers liberally and interprets them to raise the strongest arguments suggested therein. See Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994). Despite this liberal interpretation, however, an unsupported assertion cannot overcome a properly supported motion for summary judgment. See Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991).

## IV.     DISCUSSION[1]

    A.     Section 1983 Claims

        1.     Fourth Amendment Claims

            a.     Claim Against Halligan

Marshall claims, pursuant to 42 U.S.C. § 1983, that he was unlawfully detained by Halligan in violation of the Fourth Amendment to the United States Constitution. Compl. ¶ 15. The Fourth Amendment states that the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated." U.S. Const., amend. 4. A police officer may briefly

---

[1] In his Complaint, Marshall does not explicitly state which of his claims are made against Halligan alone and which are made against both Halligan and Middlefield. In light of its obligation to read Marshall's pro se submissions liberally, the court construes every claim as being made against both Halligan and Middlefield.

5

detain a suspect, consistent with the Fourth Amendment, when the officer has a reasonable suspicion that "criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968). In the context of traffic laws, "reasonable suspicion of a traffic violation provides a sufficient basis under the Fourth Amendment for law enforcement officers to make a traffic stop." U.S. v. Stewart, 551 F.3d 187, 193 (2d Cir. 2009).

While reasonable suspicion is a less demanding standard than probable cause, "the Fourth Amendment requires at least a minimal level of objective justification for making the stop." Illinois v. Wardlaw, 528 U.S. 119, 123 (2000). In assessing the reasonableness of a Terry stop, the court must consider "'the totality of the circumstances' [in the] case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (citations omitted).

The defendants argue that the results of Halligan's random license plate check in the parking lot of the convenience store, as well as Marshall's attempt to evade Halligan upon exiting the store, provided reasonable suspicion to support a Terry stop. See Defs.' Reply Memorandum (Doc. No. 41) at 1-2. The court agrees that, if Halligan's testimony were undisputed, no rational trier of fact could find that he lacked a particularized and objective basis for detaining Marshall.[2] Marshall, however, denies being present at any convenience store on the morning of March 10 and denies that he

---

[2] Marshall argues that a random license plate check itself amounts to an unreasonable search. Pl.'s Mem. in Opp. at 1. The court disagrees. The Supreme Court has held that "the exterior of a car . . . is thrust into the public eye, and thus to examine it does not constitute a search." New York v. Class, 475 U.S. 106, 114 (1986). The same logic applies to a license plate, which, of course, is affixed to the exterior of a car. See, e.g., U.S. v. Ellison, 462 F.3d 557, 563 (6th Cir. 2006) ("[S]o long as the officer had a right to be in a position to observe the defendant's license plate, any such observation and corresponding use of the information on the plate does not violate the Fourth Amendment."); Olabisiomotosho v. City of Houston, 185 F.3d 521, 529 (5th Cir. 1999) ("A motorist has no privacy interest in her license plate number.").

6

made any attempt to evade Halligan. Thus, the court finds disputed issues of material fact with regard to the question of whether Halligan's actions were supported by reasonable suspicion. Accordingly, the court cannot grant summary judgment to either party as to Marshall's Fourth Amendment claim against Halligan.

b. Claim Against Middlefield

Pursuant to the Supreme Court's decision in Monell v. Department of Social Services, a "local government may not be sued under [section 1983] for an injury inflicted solely by its employees or agents." 436 U.S. 658, 694 (1978). In other words, "a city cannot be held liable under [section 1983] on a theory of respondeat superior." Amnesty America v. Town of West Hartford, 361 F.3d 113, 125 (2d Cir. 2004). Instead, section 1983 relief against municipal entities is limited to cases in which a plaintiff's injuries are caused by "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." Monell, 436 U.S. at 694.

One method of implicating a policymaking official in a subordinate's actions is to demonstrate "that the policymaking official was aware of subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." Amnesty America, 361 F.3d at 126. "To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious." Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995). "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall

further incidents." Id. However, proof of repeated complaints is not required. Amnesty America, 361 F.3d at 128. A policymaker's failure to respond to a single incident may constitute a municipal policy if the plaintiff's evidence established that the incident, standing alone, made the need for corrective action or supervision "obvious," and that the policymaker's failure to investigate or rectify the situation was the result of a conscious choice "rather than mere negligence or bureaucratic inaction." Id.

In his Complaint, Marshall alleges that, "having previously received complaints with respect to the conduct of it[s] Constable(s), [Middlefield] failed or neglected to sufficiently supervise Halligan with respect to having sufficient reasonable cause to conduct a Terry stop . . . ." Compl. ¶ 20(d). In his response to the defendants' Cross Motion for Summary Judgment, however, Marshall points to no evidence of these past complaints, nor does he specify how many were made, when they were made, or by whom they were made. The only complaint regarding Halligan of which there is any evidence in the record is Marshall's own. Marshall attests that, following the March 10 incident, he contacted Halligan's superior, the Middlefield Resident Trooper, and "was met with what amounted to a rebuke and no actions taken." First Marshall Affidavit ¶ 9. He described this interaction in more detail in his Complaint, noting that the Resident Trooper, Thomas Topulos ("Topulos"), engaged in "about 45 minutes of alleged investigation" and then told Marshall "that he believed Halligan and would do nothing further about the matter." Compl. ¶ 11.

No rational trier of fact could find that Marshall's complaint to the Resident Trooper, standing alone, put Topulos on notice of an "obvious" need for additional supervision or other corrective action. Nor could a rational trier of fact find that

8

Topulos's decision, after a brief investigation, to accept Halligan's version of events over Marshall's amounted to deliberate indifference to Marshall's constitutional rights. Cf. Amnesty America, 361 F.3d at 128 (finding that the need for corrective action could be considered obvious where a police supervisor allegedly witnessed a brutal and "blatantly unconstitutional" beating of the plaintiff demonstrators by his subordinates). Accordingly, the court grants summary judgment for the defendants with respect to Marshall's Fourth Amendment claim against Middlefield.

        2.      First Amendment Retaliation Claims

The court next addresses Marshall's claim that Halligan and Middlefield violated the First Amendment to the United States Constitution by detaining him in retaliation for his pending civil suit against the town. Compl. ¶ 16. To prevail on a First Amendment retaliation claim, a plaintiff must prove that "(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." Curley v. Village of Suffern, 268 F.3d 65, 73 (2d Cir. 2001).

Based on the record before the court, no rational juror could find that Halligan's actions were "motivated or substantially caused" by Marshall's exercise of his First Amendment rights. As noted earlier, Halligan denies any knowledge of Marshall's pending action against Middlefield. Halligan Aff. ¶ 17. The only evidence Marshall offers to refute that claim is his observation that, when he accused Halligan of retaliation, Halligan "appeared nervous." First Marshall Aff. ¶ 8. This is insufficient to survive summary judgment. See Curley, 268 F.3d at 73 ("Specific proof of improper motivation is required in order for plaintiff to survive summary judgment on a First

Amendment retaliation claim.").

Additionally, Marshall has failed to establish that his First Amendment rights were actually chilled by Halligan's actions. Marshall claims that Halligan's actions caused him "public embarrassment, diminished health, pain and suffering, diminished health, emotional distress and duress," Compl. ¶ 16(d), but he does not claim that they led to any change in his behavior. He does not allege, for instance, that he dropped his suit against Middlefield in response to his receipt of the tickets, or even that he pursued the suit with less vigor. Curley, 268 F.3d at 73 ("Where a party can show no change in his behavior he has quite plainly shown no chilling of his First Amendment right to free speech."); see also Spear v. Town of West Hartford, 954 F.2d 63, 67 (2d Cir. 1992) (finding no chill where, after the filing of a lawsuit against him in response to a critical editorial, the plaintiff continued to write similar editorials).

Because Marshall has failed to adduce sufficient evidence to establish either (1) that Halligan's actions were motivated by Marshall's filing of a lawsuit against Middlefield, or (2) that Halligan's actions had any effect on Marshall's subsequent exercise of his First Amendment rights, the court grants summary judgment for the defendants with respect to Marshall's First Amendment retaliation claims.

   3.   Equal Protection Claims

Marshall does not specifically plead that Halligan violated his right to equal protection under the Fourteenth Amendment of the United States Constitution. He does, however, make multiple references to racial profiling, Compl. ¶¶ 1, 20(d), and cites a Connecticut statute, the Alvin W. Penn Racial Profiling Prohibition Act, as

10

providing the court with jurisdiction over his case.[3]  Compl. ¶ 4.  Such claims are properly subject to equal protection analysis.  See Simmons v. Love, No. 3:09-cv-1218 (WWE), 2012 WL 113665, at *5 (D. Conn. Jan. 12, 2012) ("Constitutional claims alleging racial profiling are subject to the analysis of the Fourteenth Amendment Equal Protection Clause.").  Additionally, Marshall alleges that "Middlefield acted with deliberate indifference to [his] equal protection . . . rights" by failing to supervise Halligan.  Compl. ¶ 20(d).  This necessarily implies that Halligan's own actions, which Middlefield failed to supervise, violated Marshall's equal protection rights.  Accordingly, the court construes the Complaint as alleging equal protection violations by both Halligan and Middlefield.

"To state a race-based claim under the Equal Protection Clause, a plaintiff must allege that a government actor intentionally discriminated against him on the basis of his race."  Brown v. City of Oneonta, 221 F.3d 329, 337 (2d Cir. 2000).  "A plaintiff alleging a claim of selective prosecution in violation of the Equal Protection Clause must plead and establish the existence of similarly situated individuals who were not prosecuted; that is because courts grant special deference to the executive branch in the performance of the core executive function of deciding whether to prosecute."  Pyke v. Cuomo, 258 F.3d 107, 109 (2d Cir. 2001); see also Azana v. City of West Haven, No. 3:10-cv-883 (JBA), 2012 WL 264559, at *9-10 (D. Conn. Jan. 27, 2012) (granting summary judgment for defendants where Hispanic plaintiffs alleging that they were arrested as a result of racial profiling could point to no facts in the record showing that

---

[3] The Alvin W. Penn Racial Profiling Prohibition Act prohibits law enforcement officers from engaging in racial profiling and imposes certain reporting requirements on municipalities with regard to racial profiling complaints.  See generally Conn. Gen. Stats. § 54-1l & 54-1m.  The court finds no authority to suggest that the statute provides a private right of action to enforce its requirements.

11

similarly situated non-Hispanic individuals were treated differently).

Here, Marshall's claims of racial profiling amount to allegations that facially neutral traffic laws were applied to him in a racially discriminatory manner. Yet he presents no evidence that he was treated differently than individuals of other races with unregistered vehicles. As a result, the court grants summary judgment for the defendants with respect to Marshall's equal protection claims.

### B. Conspiracy Claims

Marshall next alleges that Halligan "conspired with Middlefield Town Officials to injure, oppress, and intimidate [him] in the free exercise of his First Amendment right regarding his motor vehicle tax actions against Middlefield." Compl. ¶ 18. As a basis for this claim, Marshall cites a criminal conspiracy statute, 18 U.S.C. § 241. Id. Section 241, however, is a criminal statute and does not provide a private right of action. Burke v. APT Foundation, 509 F. Supp. 2d 169, 173 (D. Conn. 2007).

Earlier in his Complaint, however, Marshall alleges that the court has jurisdiction over this action under 42 U.S.C. § 1985, a civil conspiracy statute. Compl. ¶ 4. In light of its obligation to interpret Marshall's submissions to raise the strongest arguments they suggest, the court construes Marshall's Complaint as alleging violations of section 1985 by Halligan and Middlefield.

There are two subsections of section 1985 that might be considered applicable to this case. The second clause of section 1985(2) is specifically aimed at attempts to interfere with state court proceedings. It provides a right to sue "if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any

citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws . . . . ." 42 U.S.C. § 1985(2). Section 1985(3) provides a more general right to sue "[i]f two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3).

The court finds it unnecessary to decide which subsection is best applied to Marshall's claim because, under either provision, a plaintiff "states a viable cause of action . . . only by alleging a deprivation of his rights on account of his membership in a particular class of individuals." Zemsky v. City of New York, 821 F.2d 148, 151 (2d. Cir. 1987). In other words, in order to make out a valid section 1985 claim, Marshall must adduce evidence sufficient to establish not only that defendants conspired to violate his Fourth or First Amendment Rights, but also that this conspiracy was motivated by "some racial or perhaps otherwise class-based, invidiously discriminatory animus." Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)

As already discussed in the context of Marshall's equal protection claims, Marshall makes conclusory allegations of racial profiling, but he adduces no specific evidence to support an inference that the defendants were motivated by racial animus. See Grillo v. New York City Transit Authority, 291 F.3d 231, 234 (2002) (holding that in order to survive summary judgment on a section 1985 claim, a plaintiff must come forward with "at least some credible evidence" that the actions of the defendants were motivated by racial animus); Young v. McGill, No. 09-cv-1205 (CSH), 2011 WL

13

6223042, at *5 (D. Conn. Dec. 8, 2011) (granting summary judgment where the plaintiff failed to allege "any facts suggesting that any actions were taken because of his race" but instead "contend[ed] that treatment was denied in retaliation for his many complaints and grievances"). Accordingly, the court grants summary judgment for the defendants with respect to Marshall's conspiracy claims.

    C.    <u>Libel Claims</u>

Marshall next alleges that Halligan "caused a libelous report to generate publicly on the internet via the court's electronic docket . . . as a result of his unlawful Terry Stop or detention." Compl. ¶ 17.

As the Connecticut Supreme Court has noted, "it has long been established that there is an absolute privilege for statements made in judicial proceedings." <u>Petyan v. Ellis</u>, 200 Conn. 243, 245 (1986). "The effect of an absolute privilege is that damages cannot be recovered for a defamatory statement even if it is published falsely and maliciously." <u>Id.</u> at 256. Because any documents that Halligan uploaded to a state court docket regarding Marshall's tickets would undoubtedly be considered made in the course of a judicial proceeding, the court finds that Halligan is entitled to absolute privilege with regard to any statements contained therein and grants summary judgment for the defendants with regard to Marshall's libel claims.

    D.    <u>Connecticut Constitutional Claims</u>

Along with his claims under the First, Fourth, and Fourteenth Amendments of the United States Constitution, Marshall alleges violations of parallel provisions of the

Connecticut Constitution: Article First, sections four, seven, nine, and twenty. [4]   Compl. ¶ 4. As explained below, the court finds that Marshall is not entitled to an action for money damages under any of these state constitutional provisions.

        1.       Article First, Sections Seven and Nine

Article First, sections seven and nine prohibit, respectively, unreasonable searches and seizures and unlawful arrests and detentions.[5] In Binette v. Sabo, 244 Conn. 23 (1998), the Connecticut Supreme Court recognized a private right of action under sections seven and nine for a pair of plaintiffs who claimed that they were severely brutalized by police officers during a warrantless entry of their home. See Binette, 244 Conn. at 45-46 (recognizing right of action); id. at 26 (detailing plaintiffs' allegations that an officer repeatedly slammed one plaintiff's head against a car and then struck him on the head and kicked him while he was lying on the ground experiencing an epileptic seizure).

    The Binette Court expressly "declined to create an all-encompassing damages action for any and all alleged violations of state constitutional provisions." ATC Partnership v. Town of Windham, 251 Conn. 597, 613 (1999).  Instead, it held that

---

[4] Marshall cites Article XXI of the Amendments to the Connecticut Constitution to support his state equal protection claim, rather than Article First, section twenty. Compl. ¶ 4. Article XXI of the Amendments, however, served simply to amend the existing equal protection clause of Article First, section twenty to include discrimination based on physical and mental disability. See State v. Riddick, 61 Conn. App. 275, 285 (2001) ("The equal protection clause of the Connecticut constitution, article first, § 20, as amended by article twenty-one of the amendments, provides: 'No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability.'"). Consequently, the court reads Marshall's Complaint as raising a claim under Article First, section twenty.

[5] Article First, section seven states: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation." Article First, section nine states: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

15

"whether such a cause of action should be recognized would be determined on a case-by-case basis." Id. In subsequent cases, Connecticut courts have emphasized the extreme nature of the alleged conduct in Binette and declined to recognize a private right of action for less egregious violations. See, e.g., id. at 613 (noting that the Binette decision was made "in the context of allegations of an egregiously unreasonable search and seizure"); Bauer v. City of Hartford, No. 3:07-cv-1375 (PCD), 2010 WL 4429697, at *12 (D. Conn. Oct. 29, 2010) (holding that, even if the defendant police officers' entry into the plaintiff's home "were illegal . . . that fact does not rise to the level of egregiousness necessary to sustain a claim under the Connecticut Constitution"); Faulks, Jr. v. City of Hartford, No. 3:08-cv-270 (VLB), 2010 WL 259076, at *10 (D. Conn. Jan. 19, 2010) (finding no right of action where defendant officers' alleged misconduct "involve[d] no physical confrontation akin to the level of force at issue in Binette"); Martin v. Brady, 64 Conn. App. 433, 442 (2001) ("Apart from the illegality of the entry, the plaintiff complains of having been pushed to the ground on one occasion and of having windows and doors smashed on another occasion. We are not persuaded that these allegations, if true, rise to the legal of egregious misconduct.").

    Here, Marshall claims that Halligan unlawfully entered his private driveway and detained him without reasonable suspicion, but he does not allege that Halligan physically abused him or even attempted to physically restrain him in any way. Nor does Marshall allege that Halligan entered his house. The court finds that this alleged conduct is insufficiently egregious to justify a Binette claim. Summary judgment is thus granted for the defendants with respect to Marshall's claims under Article First, sections seven and nine.

### 2. Article First, Sections Four and Twenty

Article First, section four provides that "[e]very citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that liberty." Article First, section twenty states that "[n]o person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his civil or political rights because of religions, race, color, ancestry or national origin."

The court finds no cases in which a Connecticut court has recognized a private right of action for money damages under either section four or twenty and multiple cases in which courts have expressly declined to recognize such claims. See, e.g., Spector v. Board of Trustees of Community-Technical Colleges, 463 F. Supp. 2d 234, 254 (D. Conn. 2006) (finding no private right of action under section twenty); Wylie v. West Haven, No. CV065006403, 2010 WL 2196493, at *2 (Conn. Super. Apr. 21, 2010) (collecting Superior Court cases finding no private right of action under section twenty); McKiernan v. Amento, No. CV010453718S, 2003 WL 22333200, at *4 (Conn. Super. Oct. 2, 2003) (collecting Superior Court cases finding no private right of action under section four); Lopez v. Smiley, 375 F. Supp. 2d 19, 24 n.2 (D. Conn. 2005) (finding no cases in which a Connecticut state court recognized a claim for money damages under section four). Accordingly, the court grants summary judgment for the defendants with respect to Marshall's claims under Article First, sections four and twenty.

### E. Motion to Appoint Counsel

Finally, the court addresses Marshall's Motion to Appoint Counsel. Doc. No. 36. In a civil matter, "the court may request an attorney to represent any person unable to

17

employ counsel." 28 U.S.C. § 1915(e)(1).  A district judge has "[b]road discretion . . . in deciding whether to appoint counsel pursuant to this provision." Hodge v. Police Officers, 802 F.2d 58, 60 (2d Cir. 1986).  In deciding whether to appoint counsel, the court

> should first determine whether the indigent's position seems likely to be of substance.  If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

Id. at 61-62.  The Second Circuit has stressed that "courts should not grant [Motions to Appoint Counsel] indiscriminately." Cooper v. A. Sargenti Co., Inc., 877 F.2d 170, 172 (2d Cir. 1989); see also id. ("Volunteer lawyer time is a precious commodity . . . . [and] should not be allocated arbitrarily, or on the basis of the aggressiveness of and tenacity of the claimaint.").

In considering whether Marshall's position is "likely to be of substance," the court notes that one count of the Complaint—Marshall's claim that Halligan detained him without reasonable suspicion in violation of the Fourth Amendment—has withstood a motion for summary judgment.  However, this fact alone does not entitle Marshall to counsel. Crenshaw v. Herbert, 409 Fed. Appx. 428, 430 (2d Cir. 2011) ("[W]ithstanding a motion for summary judgment is not always enough."); Hodge, 802 F.2d at 60 ("If mere bald assertions by an indigent, which technically put a fact in issue and suffice to avert summary judgment, required appointment of [counsel], the demand for such representation could be overwhelming.").  Here, the only material evidence in support of Marshall's claim is that featured in his own affidavit.

Furthermore, even assuming that Marshall's case does pass the threshold requirement of merit, the court finds that other Hodge factors weigh against appointing counsel.  First, the primary issue in dispute—whether Halligan had reasonable suspicion to justify entering Marshall's driveway and ticketing him—is not legally complex and ultimately rests on a credibility determination with regard to Marshall's and Halligan's competing testimony.  Crenshaw v. Herbert, 409 Fed. Appx. 428, 430 (2d Cir. 2011) (finding a case "suitable for pro se litigation" where "it was clear that [the plaintiff's] claims lacked procedural, technical, or legal complexity, required little or no factual investigation, and ultimately rested on a pure credibility determination").

Additionally, the court has no doubt of the plaintiff's "ability to present the case." Hodge, 802 F.2d at 62.  The court is familiar with Marshall, having presided over his recent criminal trial.  In that case, the court made three successive appointments of CJA counsel for Marshall, but he ultimately chose to represent himself.  At his subsequent trial and sentencing, Marshall demonstrated that he is fully capable of researching and presenting both written and oral legal arguments.  See Crenshaw, 409 Fed. Appx. at 431 (finding that district court did not abuse its discretion by refusing to appoint counsel for an incarcerated plaintiff who had demonstrated competence at past conferences and via written submissions to the court).

In light of the case's lack of legal complexity and Marshall's demonstrated ability (and desire) to litigate on his own behalf, the Motion to Appoint Counsel is denied.

## V.     CONCLUSION

For the foregoing reasons, the plaintiff's Motion for Partial Summary Judgment (Doc. No. 25) and Motion to Appoint Counsel (Doc. No. 36) are denied.  Additionally,

the defendants' Cross Motion for Summary Judgment (Doc. No. 32) is granted in part and denied in part.  Summary judgment is granted for the defendants with respect to all counts of the Complaint except Marshall's Fourth Amendment claim against defendant Halligan.

**SO ORDERED.**

    Dated at Bridgeport, Connecticut, this 23rd day of February, 2012.


                                           /s/ Janet C. Hall
                                          Janet C. Hall
                                          United States District Judge